UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

KEVIN J. O'BRIEN,

                                    Plaintiff,

                          v.

HARRIS, ST. LAURENT & CHAUDHRY LLP AND
JONATHAN HARRIS,

                                  Defendants.
-----------------------------------------------------------------------x

Index No.: 1:16-cv-06236

## DECLARATION OF KEVIN J. O'BRIEN

Kevin J. O'Brien, declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and accurate:

1. I am the Plaintiff in the above-captioned action. I am a partner in the law firm Ford O'Brien, LLP.

2. I have personal knowledge of the facts set forth herein. These statements are made for the purpose of opposing Defendants' FRCP R. 11 motion.

3. Defendants have argued that four sets of allegations within the Complaint are false. Defendants, as set forth below, are mistaken.

    I.    **The Harris Firm Refused to Negotiate in Good Faith**

4. Negotiations between the parties over the wages then owed to me began with the Harris Firm (or "the Firm") breaching its agreement to me.

5. Even before I gave notice on 12/4/15, I was owed money from the Firm – a "true up" payment for the third quarter, estimated at the time to be over $18,000, plus my

1

November draw, which was $35,000, for a total in excess of $50,000. *See generally* R. Doc. 1, paras. 10-11, for how this process is supposed to work.

6. In our discussions, the Firm agreed to pay me on this obligation even after I had given notice of my departure, as reflected in an email Andrew St. Laurent sent me on 12/4/15 (Exh. 1 hereto). Andrew reiterated on 12/11/15 that I was owed "meaningful sums by the Firm." (Exh. 2).

7. However, after my departure, the Harris Firm began to renege on its agreement as defendant Jonathan Harris became directly involved. *See* my 12/4/15 and 12/10/15 emails to Andrew (Exhs. 3 and 4, respectively).

8. A pattern of avoidance and obfuscation continued from there. I made it very clear, beginning no later than my 12/16/15 email (Exh. 5), that I would not meet with Jon or Andrew unless there was basic agreement that I would be paid for my rightful share of the revenues I brought into the Firm, which was a matter of black and white.

9. As of 12/16/15, I was still talking only about the November draw plus the third quarter true up. But the Firm never attempted to reach agreement on what I was owed, and as a result these amounts have never been paid to me.

10. In my 1/18/16 email (Exh. 6), I summarized what I knew, as of that date, about the fee revenue I had brought into the Firm for work done in the fourth quarter – at the time, some $253,000 – and asked the Firm to calculate what my share was of those fees, following the prescribed method used by the Firm.[1]

---

[1] This email also clarifies Defendants' vague reference to "a $15,000 draw" (Brief at 9-10) that I have supposedly not taken into account in presenting what is owed me. This is incorrect. For my October draw I received two checks, one for $20,000 and one later for $15,000. I generally characterized these payments as a $35,000 draw, as in my 12/15/15 discussions with Andrew, but Jon and Andrew at times characterized it as a $20,000 draw, with the balance

2

11. Jonathan Harris responded with numbers riddled with self-serving errors, as I pointed out in my 1/27/16 email (Exh. 7). I reiterated therein that I needed from the Firm "a serious, bottom-line payment proposal based on the data you and I have been discussing, which is not in dispute."

12. Jon responded instead, in emails on 1/27/16 and 1/28/16, with vague suggestions about a "separation agreement" between the two law firms. I again reminded him, in my 1/28/16 email (Exh. 8), that "for there to be any constructive discussion" I needed to know what they claimed I was owed as my share of received fee revenue.

13. Jon's response this time was a 2/1/16 email sketching, in less than a page, subjects for a "separation agreement" between the two law firms, but again saying nothing about the wages I was owed. Although Jon had indicated he wanted to wrap this agreement up by March 1st, several weeks went by and I heard nothing from him. In fact, I never heard from him again about the proposed "separation agreement." The "agreement" idea led to nothing except weeks of further delay.

14. Instead, Jon switched gears completely. Specifically, Evan Bolla sent me an email on 3/9/16 (Exh. 9) suggesting the Firm could simply "assign" me "the outstanding $97,655.24 in receivables" from my clients – when in reality my clients' total receivables at the time were $66,000 or less and declining.

15. In a 4/11/16 email (Exh. 10) to Jon and Andrew, having collected or arranged to collect for the Harris Firm *all* the outstanding receivables owed to it by my clients, I summarized the results: $277,643.75 in fees, of which my share (again, using the same method always

---

applied to the third quarter true up. As I explain in the 1/18/16 email, which includes the $15,000 as part of my draw, "the arithmetic is the same" regardless of how the $15,000 is characterized.

used in the Firm at that time) was $89,132.60. I also said in the email that I was open to settling the matter, "but it must be done soon."

16. Once again – as in the prior months – the Harris Firm refused to engage with these numbers in any way. In a 4/21/16 email (Exh. 11), Evan claimed "discrepancies" in the numbers I presented on 4/11/16, but did not identify or explain any supposed error.

17. Instead, in this same email, the Firm tried yet another gambit, offering to either keep or assign its supposed "interest" in the Kalach case, a Ford O'Brien matter still being litigated in which neither the Harris Firm nor Ford O'Brien has a legal right to any percentage of the proceeds. As before, the Firm failed to acknowledge my claim to wages earned as a former nonequity partner.

18. I sent the Harris Firm an email on 5/6/16 (Exh. 12) offering to settle this matter for $80,000, rejecting the applicability of the Kalach matter to what was a straightforward claim for unpaid wages. Evan Bolla responded on 5/12/16 (Exh. 13), again offering to assign the Harris Firm's "interest" in the Kalach matter and ignoring my settlement proposal altogether.

19. According to the docket, the Harris Firm has since filed a judgment lien in the Kalach case.

## II. Defendants Attempted to Reduce my Wage Claim to Zero

20. Defendants claim that "at no time" did they attempt to reduce my wage claim to zero. This is untrue. As noted above, beginning in April 2016, the Firm offered to assign me its nonexistent rights to the Kalach matter, which effectively reduced my $90,000 claim to zero. *See* the aforementioned 4/21/16 and 5/12/16 emails (Exhs. 11 and 13). In the

4

latter email, the Firm repeated this offer and ignored completely my settlement proposal, which was for a percentage of the wages it owes me.

### III. Defendants have Mischaracterized Andrew St. Laurent's December 4th and 11th Emails

21. Although a mistake was made early in my discussions with Andrew St. Laurent concerning certain collections, the mistake was the fault of the Firm and, in any case, was totally immaterial to Andrew's admission to me that "you were then and are now owed meaningful sums by the Firm" (Exh. 2; *see also* Exh. 1).

22. On 12/3/15, in the context of discussions regarding my November draw and a true up payment for the third quarter, Andrew St. Laurent sent me collection figures from the Harris Firm's accounting manager (Exh. 14). In an email on 12/6/15, Andrew informed me he had discovered the firm had made a "double counting" error in those figures (Exh. 15). I immediately examined the numbers and emailed him the same day, agreeing that the firm's numbers were in error and had inflated "my share of 3rd quarter revenue," which meant my true up payment for that quarter should be $18,940.49 (Exh. 16).

23. The Harris firm's error is irrelevant to Andrew's admissions to me on 12/4/15 and 12/11/15, for the following reasons.

24. Andrew's 12/4/15 email (Exh. 1) says two things in response to my email of the same date (Exh. 3): "We can do $50k on Monday [12/7/14]," which was an agreement to pay me the roughly $50k owed me for my third quarter true up plus my November draw (roughly $18,000, at the time, plus $35,000); and "an additional $35k against $170k in collected receivables [for the fourth quarter] also seems reasonable." The first statement assumes that my third quarter true up should be roughly $15k ($50,000 minus $35,000), which is in the range of what I calculated on 12/6/15 ($18,940.49) *after taking into*

5

*account the Firm's double counting error* (Exh. 16). And the latter statement, since it necessarily pertained to another distribution based on fourth quarter collections, is not affected by an overstatement of third quarter collections.

25. In other words, the Firm's double counting correction, had it been known on 12/4/15, would not have affected the Firm's agreement on 12/4/15 to pay me the sums quoted in the complaint. By no means, then, was the failure to mention the correction in the Complaint "a material omission."

26. As for Andrew's additional admission on 12/11/15 – "[Y]ou were then and are now owed meaningful sums by the Firm" – it necessarily was unaffected by the double counting error, since Andrew made the admission five days *after* the double counting error came to light on 12/6/15.

### IV. Collection of All Receivables

27. Defendants' statement that "Mr. O'Brien [did] not collect receivables from HSC clients for the firm" [Brief at 10] is demonstrably false.

28. By April 2016, I had collected for the Harris Firm all of the outstanding receivables owed to it by my clients. These efforts began early on.

29. In emails on 12/4/15 (Exh. 17), the day I gave notice, I sent to the Firm my draft invoices for all unbilled time and expenses, which were ready to be finalized by accounting and sent to clients. In the aforementioned 12/10/15 email (Exh. 4), I reminded Andrew St. Laurent that it was in everyone's interest to send out those invoices. Yet the Firm waited until February 2016 before contacting me for approval to send out the invoices, which I immediately granted in a 2/11/16 email (Exh. 18).

6

30. Apparently, if Defendants' motion papers are accurate, the Firm did not actually send out the invoices until March.

31. Up through April 2016, I had a number of telephone and email conversations with clients about paying the Harris Firm's outstanding bills. Of course, these successful efforts at collecting for the Firm had no impact on the Firm's determination to withhold from me my rightful share of collections.

32. In early April 2016, Client A paid its outstanding Harris Firm bill ($19,040) after discussions with me. The client sent the check to me, but of course the check was made out *to the Harris Firm*. In my aforementioned 5/6/16 settlement offer, I notified the Harris Firm that I had the check and would convey it to the Firm (Exh. 12). Afterwards, I forgot I had the check. After the Harris Firm contacted Client A, in July 2016, the client contacted me and I advised it to make out a new check to the Firm and send it to them directly, which evidently is what happened. Defendants could have contacted me about the check directly after 5/6/16, but chose not to do so.

33. Defendants (Evan Bolla) also claim that they received payment in April from Client B and that "Mr. O'Brien played no role in HRC's collection of this outstanding balance." Evan Bolla has no way of knowing whether this statement is true or not, and in fact it is totally false.

34. I personally saw to it that Client B paid the Firm's bill. In a 3/11/16 email (Exh. 19), I reached out to Client B and asked if the Harris Firm had sent it an invoice, which the client had just received. I then followed up by email with Client B on 3/21/16 (Exh. 20) (after I had returned from vacation) and we discussed the matter by telephone. I followed up again by email with Client B on 4/7/16 (Exh. 21) to make sure the bill had been paid,

7

and learned that the bill had just been approved for payment. If Defendants' representations are accurate, the Firm eventually received payment a few weeks later.

Dated: November 16, 2016

                                                    Kevin J. O'Brien